HAROLD C. and VINNIE G. LANG, ET AL., [1] v. COMMISSIONER OF INTERNAL REVENUE, Respondent. Lang v. Commissioner
Docket Nos. 8854-79, 8855-79, 8856-79.
United States Tax Court
T.C. Memo 1982-149; 1982 Tax Ct. Memo LEXIS 597; 43 T.C.M. (CCH) 874; T.C.M. (RIA) 82149; March 24, 1982. *597 Individual petitioners, the Langs, purchased all the stock of Kim-Sek, Ltd., which owned a ski lodge, for $ 742,000, represented by the Langs' notes. The ski lodge was carried on Kim-Sek's books at approximately $ 260,000. Several years later Kim-Sek was liquidated and all of its assets were transferred to a new corporation, Lang Properties, Inc., in which the Langs owned all the stock, in exchange for the assumption of liability on the Langs' note. Held, the Langs did not intend to liquidate Kim-Sek and acquire its assets when they purchased the Kim-Sek stock. Held,further, the liquidation and reincorporation of Kim-Sek was a reorganization and the basis of Lang Properties in the assets was the same as Kim-Sek's basis in those assets. Held,further, the assumption of liability on the Langs' notes did not create a bona fide indebtedness of Lang Properties and payments made by Lang Properties on those notes constituted dividends to the Langs. Held,further, Lang Properties may not deduct the interest it paid on the Langs' notes. Frank M. Cavanaugh, for the petitioners. Thomas G. Hodel, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent *598 determined deficiencies in petitioners' Federal income tax for the years 1973 and 1974 in the following amounts: Docket
No.
Petitioner
Year
Deficiency
8854-79
Harold C. and Vinnie G. Lang
1973
$ 200.63
1974
765.47
8855-79
Arthur W. and Virginia C. Lang
1973
184.00
1974
623.00
8856-79
Lang Properties, Inc.
[2] 1973
14,334.01
1974
3,471.25
These cases have been consolidated for purposes of trial, briefing, and opinion. The primary issue is whether a series of transactions whereby the individual petitioners purchased the stock of a corporation, liquidated it, and transferred the assets to a newly formed corporation constituted a purchase of assets by the new corporation, or instead constituted a reorganization for Federal tax purposes. The resolution of this issue will affect the following specific issues raised by the pleadings: (1) Whether respondent properly disallowed part of the depreciation deduction claimed by the corporate petitioner, which disallowance is based on his determination that the basis of its assets are *599 the same as they were in the hands of the liquidated corporation, (2) whether respondent properly disallowed part of the interest deduction claimed by the corporate petitioner, which disallowance is based on his determination that the interest paid was not an ordinary and necessary business expense and that it was not paid on a bona fide indebtedness of the corporate petitioner, and (3) whether the individual petitioners received a dividend when the corporate petitioner, after assuming their liabilities, made payments thereon. [3] *600 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by reference. Petitioner Lang Properties, Inc. (hereinafter petitioner), doing business as High Country Inn, is a Colorado corporation with its principal place of business at Winter Park, Colo., at the time of the filing of its petition herein. Petitioner filed Federal corporate income tax returns for its fiscal years ended September 30, 1973, and September 30, 1974, with the Internal Revenue Service Center, Ogden, Utah. Petitioners Harold C. Lang and Vinnie G. Lang, husband and wife, and petitioners Arthur W. Lang and Virginia C. Lang, husband and wife, resided in Winter Park, Colo., at the time they filed their petitions herein. Petitioners Vinnie G. Lang and Virginia C. Lang are parties solely by reason of their filing joint returns with Harold c. Lang and Arthur W. Lang; consequently, Harold C. Lang and Arthur W. Lang will be referred to as the individual petitioners or as the Langs. Prior to 1970, petitioners Harold C. Lang and Arthur W. Lang, *601 who were brothers, were interested in purchasing a ski lodge in Colorado. However, due to the Langs' lack of adequate capital, it was necessary for them to find a seller who would finance the purchase. The Langs originally became interested in purchasing a ski lodge in Aspen, Colo., after visiting that area in 1968 or 1969. The owner of the lodge where the Langs were staying indicated that he was going to have to sell the lodge since his wife was ill. The negotiations proceeded throughout most of the year to the point where the Langs were convinced that the deal would go through.Subsequently, the deal fell through when the ski lodge owner's wife recovered from her illness and the owners decided not to sell the lodge. Following that time, the Langs looked at several ski lodges in the Aspen area but were unable to find a lodge they could purchase. During late 1969 or early 1970, the Langs first started negotiations to purchase a ski lodge known as the High Country Inn (hereinafter the lodge). This lodge was owned by Kim-Sek Ltd. (hereinafter Kim-Sek), a Colorado corporation. Kim-Sek was owned equally by two shareholders, Ralph W. Kimball (hereinafter Kimball) and Edward J. Matousek *602 (hereinafter Matousek). The Langs retained attorney H. Robert Walsh (hereinafter Walsh) to help negotiate the sales contract. Walsh, however, did not give tax advice to the Langs regarding the tax consequences of the purchase. On April 13, 1970, the Langs entered into an agreement with Kim-Sek to lease the lodge for a term of 10 years, with an option to purchase the property at the expiration of the lease. Later, the agreement was canceled and the parties decided to pursue alternative ways of structuring the transaction. [4] Subsequently, on July 9, 1970, the Langs entered into an agreement with Kimball and Matousek whereby the Langs would purchase 100 percent of the stock of Kim-Sek, taking title to the stock in their individual names. Under the terms of the sale the Langs gave promissory notes of $ 363,000 to Kimball, $ 343,000 to Matousek, and $ 36,000 to National Real Estate & Management Co., the realtor which handled the sale, for a total purchase price of $ 742,000. The Langs agreed that they would continue to operate the business of Kim-Sek as a separate resort enterprise, that they would not, without the prior written consent of the sellers, dispose of any of the corporate *603 assets in excess of $ 5,000 in any 1 calendar year, sell or transfer in any other manner any of the shares purchased under the agreement as long as the notes payable to Matousek and Kimball were unpaid, or cause the corporation to declare or pay any dividends. During the latter part of 1970 and during 1971, the Langs determined they needed to borrow additional money. In negotiating for loans with various banks, they were made aware *604 that in order for them to obtain financing it would be necessary for the corporate books to reflect the true value of the lodge. At the time the lodge was being carried on the corporate books at $ 260,000, the same figure that Kim-Sek had been using when Kimball and Matousek owned the stock. The Langs had incurred a liability in the amount of $ 742,000 in purchasing the Kim-Sek stock and banks were unwilling to loan the Langs money when they had a liability of $ 742,000 and an asset having a book value of only $ 260,000. In a letter to one of their accountants, E. J. Hudak (hereinafter Hudak), dated November 16, 1970, the Langs indicated that they wanted a statement prepared that would more realistically show the value of the corporation's assets in relation to the purchase price paid for the Kim-Sek stock. In a letter to the Langs dated October 11, 1971, Hudak suggested that the Langs organize another corporation for the purpose of acquiring the Langs' stock in Kim-Sek. According to Hudak, one of the purported benefits of doing this was that in submitting financial statements to lending institutions, the new corporation would identify at all times the true cost of the stock acquisition. *605 [5]
In November 1971, the Langs requested advice from John D. Todd, another one of their accountants (hereinafter Todd), as to how to remedy the fact that Kim-Sek's corporate books carried the lodge on its books at $ 260,000 instead of at $ 742,000, the amount the Langs had paid for the Kim-Sek stock. In a letter dated December 13, 1971, Todd evaluated three alternatives to remedy the situation. These alternatives included Hudak's suggestion of forming a separate holding company, and Todd's own proposals of filing as a subchapter S corporation or of liquidating Kim-Sek and immediately thereafter transferring its assets to a newly formed corporation. Todd suggested that the liquidation-reincorporation proposal be utilized if an appraisal of Kim-Sek's assets indicated that the fair market value of the assets was close to the price the Langs had paid for the Kim-Sek stock. [6] After an appraisal of the assets *606 of Kim-Sek was completed, the Langs, upon the advice of their accountants, decided to proceed with the liquidation of Kim-Sek followed by its immediate reincorporation as Lang Properties, Inc. By letters dated May 26, 1972, and June 19, 1972, the Langs requested Kimball's and Matousek's consent to the proposed liquidation. On January 31, 1973, almost 3 years after the original purchase of the Kim-Sek stock, the Langs completed the liquidation of Kim-Sek. [7]
On February 1, 1973, petitioner Lang Properties, Inc., was incorporated by the Langs transferring $ 5,000 for all of petitioner's stock. The Langs then transferred all of the assets they received in the liquidation of Kim-Sek to petitioner in *607 exchange for it assuming their notes payable owing to Kimball and Matousek. No changes were made in the operation of the business and the Langs owned the same percentage of the new corporation as they had owned in Kim-Sek. [8] Petitioner made payments in 1974 and 1975 on the indebtedness of the Langs that it had assumed. Petitioner filed returns for the period February 1, 1973, through September 30, 1973, and for September 30, 1973, through September 30, 1974. On these returns, petitioner claimed depreciation of $ 37,881.18 and $ 62,041.34 for 1973 and 1974 after increasing the adjusted basis in its assets to their fair market value. Petitioner also claimed interest deductions of $ 25,605.95 and $ 50,096.58 for 1973 and 1974 of which $ 16,651.58 and $ 24,713.83 was attributable to principal and interest it paid on the notes to Kimball and Matousek. For 1973 and 1974, respondent disallowed in his statutory notice of deficiency, $ 13,424 and $ 23,818 of the depreciation claimed and $ 16,651.58 and $ 24,712.83 of the interest expense deductions claimed by petitioner. In addition, he determined that each of the Lang *608 brothers received a constructive dividend of $ 12,650 and $ 13,800 for 1973 and 1974 when petitioner paid off part of the notes payable to Kimball and Matousek. OPINION The primary issue is whether a series of transactions whereby the Langs purchased the stock of Kim-Sek, liquidated it, and transferred its assets to petitioner constituted a purchase of assets by petitioner, or instead constituted a corporate reorganization under section 368(a)(1)(D) or (F). [9] *609 The Langs contend that they purchased the stock of Kim-Sek for the purpose of acquiring its assets and that therefore, under the step transaction doctrine, the stock purchase, followed by the liquidation of Kim-Sek and the transfer of its assets to petitioner, should be treated as a purchase of assets by petitioner. Alternatively, the Langs contend that the liquidation is governed by sections 331(a) and 334(a), resulting in the Langs taking a basis in the assets equal to their fair market value, which then took an equal carryover basis when transferred to petitioner; and that these liquidation provisions should take precedence over the reorganization provisions. Finally, the Langs argue that in substance these transactions qualify under sections 332 and 334(b)(2) as a parent-subsidiary liquidation resulting in petitioner taking a basis in the assets equal to the amount the Langs paid for the Kim-Sek stock. Respondent counters first that, in order for the step-transaction doctrine to apply to the stock purchase and subsequent liquidation-reincorporation, the Langs must have had the intention of liquidating Kim-Sek at the time they purchased *610 its stock. Since they did not, the step-transaction doctrine is not applicable to treat petitioner as the purchaser of the assets. Instead, respondent asserts that the step-transaction doctrine applies only to the liquidation-reincorporation of Kim-Sek, resulting in these transactions being treated as a reorganization. Respondent further contends that sections 331(a) and 334(a) are not applicable since the reorganization provisions take precedence over the liquidation provisions. Finally, respondent contends that sections 332 and 334(b)(2) are inapplicable since they deal with the liquidation of one corporation by another corporation which this was not. For the reasons set forth below, we agree with respondent. It is well settled that the incidence of taxation depends upon the substance of a transaction. Commissioner v. Court Holding Co.,324 U.S. 331 (1945). For this reason, we held in Kimbell Diamond Milling Co. v. Commissioner,14 T.C. 74 (1950), that when the stock of a corporation is purchased for the purpose of liquidating it and acquiring its assets, the transaction shall be regarded merely as a purchase of those assets. 9aGriswold v. Commissioner,45 T.C. 463, 472 (1966), *611 affd. 400 F.2d 427 (5th Cir. 1968). In Estate of Suter v. Commissioner,29 T.C. 244 (1957), in a Court-reviewed opinion, we held this rule applied even though an individual purchased stock of a corporation for cash and a note, liquidated the corporation, and then transferred the assets to a newly formed corporation solely owned by him in return for cash and that corporation assuming the note. In that case the newly formed corporation was treated as if it had purchased the assets for its own note. See also United States v. M.O.J. Corp.,274 F.2d 713 (5th Cir. 1960). However, in Griswold v. Commissioner,supra, we stated that in order for the step-transaction doctrine to apply, the taxpayer must have purchased the stock of a corporation for the purpose of liquidating it and obtaining its assets. The mere intent to purchase assets is not enough. Griswold v. Commissioner,supra.Therefore, the relevant inquiry in the present case is whether *612 the Langs purchased the stock of Kim-Sek for the purpose of liquidating it and obtaining the lodge. In the instant case, we find that the Langs did not meet this requirement.At the time the Langs were negotiating for the purchase of the Kim-Sek stock, they were represented by their attorney, Walsh. However, Walsh was not qualified to give the Langs tax advice and accordingly declined to do so. Consequently, the Langs were content to acquire the stock of Kim-Sek and to continue operating the lodge in that corporation indefinitely. It was not until later that the Langs were aware that they had a problem. Since the Langs had purchased the stock of Kim-Sek, the basis of its assets remained at $ 260,000, even though the Langs had paid a total purchase price for the Kim-Sek stock of $ 742,000. As a result of this, the Langs had difficulty obtaining necessary financing for the business. It was at this point that the Langs first began contacting their accountants asking for advice on how to alleviate the problem. First, in a letter dated November 16, 1970, to one of their accountants, Hudak, the Langs indicated that they wanted a statement prepared that would show the value of the corporate *613 assets was equal to the amount they had paid for the Kim-Sek stock. In a letter to the Langs dated October 11, 1971, Hudak suggested that the Langs organize another corporation to acquire the Langs' stock in Kim-Sek. The possibility of liquidating Kim-Sek was not mentioned at that time. Later, in October or November of 1971, the Langs contacted Todd, also an accountant, as to how to remedy the fact that Kim-Sek's corporate books did not reflect the amount the Langs had paid for their stock. For the first time the possibility of liquidating Kim-Sek was contemplated, assuming an evaluation of the assets of Kim-Sek showed that there would be little tax consequences (gain) under section 331(a).Accordingly, it cannot be said that the Langs purchased the stock of Kim-Sek for the purpose of liquidating it to acquire the lodge. Additional evidence showing that the Langs did not purchase the stock of Kim-Sek to liquidate it and obtain its assets can also be found in the contract to purchase the stock. In that agreement the Langs agreed that they would continue to operate Kim-Sek as a separate resort enterprise, and that they would not transfer in any way any of their shares of Kim-Sek or *614 an amount of the assets of Kim-Sek exceeding $ 5,000 per year, without the prior consent of the sellers, Kimball and Matousek. Thus, in order for the Langs to transfer their shares to Kim-Sek in return for Kim-Sek's assets, and thereby liquidate Kim-Sek, they needed the sellers' permission. Had the sellers decided not to give their permission, the Langs could not have even liquidated Kim-Sek. Based upon all the foregoing, we find that the Langs did not purchase the stock of Kim-Sek for the purpose of liquidating it and acquiring its lodge and accordingly the step-transaction doctrine is not applicable to treat petitioner as the purchaser of the lodge. Since the purchase of the Kim-Sek stock cannot be combined with the liquidation and subsequent reincorporation, respondent contends that the liquidation and immediate reincorporation were a reorganization under section 368(a)(1)(D) or (F). [10] *615 We agree. The Langs liquidated Kim-Sek and on the same day transferred its assets to a newly formed corporation owned by them in the same proportion as they owned Kim-Sek. It has been held by this Court and others that a liquidation of a corporation followed by the immediate transfer of all its assets to a newly formed corporation, which is owned by the same shareholders in the same proportion they owned the liquidated corporation, is to be treated as a reorganization for Federal tax purposes. Helvering v. Alabama Asphaltic Limestone Co.,315 U.S. 179 (1942); James Armour, Inc. v. Commissioner,43 T.C. 295 (1964); Babcock v. Phillips,372 F.2d 240 (10th Cir. 1967), cert. denied 387 U.S. 918 (1967). [11] *616 Accordingly, we hold that the liquidation-reincorporation of Kim-Sek constituted a corporate reorganization. Petitioner alternatively contends that the liquidation of Kim-Sek is governed by sections 331(a) and 334(a) resulting in the Langs taking a basis in the lodge equal to its fair market value, which then took a carryover basis equal to the same fair market value when transferred to petitioner; and that these liquidation provisions should take precedence over the reorganization provisions. The argument that the liquidation provisions should take precedence over the reorganization provisions in a reincorporation situation was expressly rejected in Ringwalt v. United States,549 F.2d 89, 91 (8th Cir. 1977), where the court stated that "when an ostensible liquidation is tainted by reincorporation of the original *617 corporation's operating assets in a 'new' corporation controlled by the same shareholders, * * * the series of corporate transactions constituting a liquidation-reincorporation is collapsed, and the tax treatment accorded to reorganizations preempts that accorded to complete liquidations. [Cits. omitted.]" See also American Manufacturing Co., Inc. v. Commissioner,55 T.C. 204 (1970); Babcock v. Phillips,supra.
The Langs' last contention is that petitioner should receive a step-up in the bases of its assets received in the liquidation-reincorporation to fair market value pursuant to sections 332 and 334(b)(2). Section 334(b)(2) requires, inter alia, that property be received by a corporation in a distribution in complete liquidation of another corporation. Section 332(a) provides that no gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation. These sections are obviously inapplicable since petitioner did not receive a distribution in complete liquidation of another corporation, but rather acquired the property from the Langs. Thus petitioner, which owned no stock of Kim-Sek, did not acquire the property *618 in the liquidation of another corporation as required by sections 334(b)(2) and 332. Accordingly, these sections are not applicable. See International State Bank v. Commissioner,70 T.C. 173, 179 n. 10 (1978). Having determined that the series of transactions involved herein constituted a reorganization, we turn to the specific issues raised by the parties.
Respondent disallowed part of the depreciation deduction claimed by petitioner for the taxable years 1973 and 1974. Such disallowance is based on respondent's determination that petitioner took a carryover basis in the assets from Kim-Sek.
Section 362(b) provides that if property was acquired by a corporation in connection with a reorganization then the basis shall be the same as it would be in the hands of the transferor. Since we have determined that the series of transactions constituted a reorganization, the basis of petitioner's assets are determined under this section. Therefore, petitioner, in calculating its depreciation deduction, should have used the same basis that Kim-Sek had in the assets. Instead, petitioner based its depreciation on the fair market value of the assets, and thus respondent's determination must *619 be sustained. See Griswold v. Commissioner,supra.
Respondent next contends that each of the Lang brothers received a constructive dividend under sections 301 and 316 when petitioner, after assuming the Langs' indebtedness to Kimball and Matousek, made payments thereon. [12] Respondent further contends that petitioner is not entitled to deduct the payments made on the assumed indebtedness of the Langs. Due to our holding herein that the step-transaction doctrine is inapplicable, we are unable to treat the series of transactions as a purchase of assets by petitioner in return for its own notes. Instead we have concluded that petitioner acquired the assets of Kim-Sek in a reorganization. The Langs contributed no additional property to petitioner and consequently petitioner had no reason to assume the obligations on the notes the Langs had given to acquire the Kim-Sek stock. Those notes did not represent bona fide indebtedness of petitioner. *620 Thus the payments made by petitioner on those notes were made for the benefit of the Langs and constituted dividends to the Langs to the extent of the corporate earnings and profits and are not deductible by petitioner. Griswold v. Commissioner,supra.See also Iverson v. Commissioner,29 B.T.A. 863 (1934); Wall v. United States,164 F.2d 462 (4th Cir. 1947); Zipp v. Commissioner, 28 T.C. 314 (1965), affd. 259 F.2d 119 (6th Cir. 1958), cert. den. 359 U.S. 934 (1959). Respondent allowed the individual petitioners, the Langs, interest deductions for their proportionate shares of the amounts paid on the indebtedness that was attributable to interest, which we approve. The Langs, however, contend that since the sales contract by which they purchased the stock of Kim-Sek forbid them from declaring or paying dividends without the prior written consent of the sellers, which was not obtained, the dividend was illegal and the Langs have an obligation to return the dividend and may not be treated as receiving a constructive dividend. This contention is without merit. We are required to look at the actual conduct of the parties, not the legality of that conduct. The fact that the dividend *621 was forbidden under local law or illegal does not preclude it from being treated as a dividend for tax purposes. Reynolds v. Commissioner,44 B.T.A. 342, 351 (1941), Duffy v. Commissioner,2 T.C. 568 (1943). We recognize that the result we reach in this case is harsh on petitioners.The transaction could have been structured to provide a much more favorable result taxwise for petitioners. But since we cannot in good faith on the record before us find that at the time they purchased the Kim-Sek stock they intended to liquidate Kim-Sek and either operate the lodge in their own names or immediately transfer the assets to a new corporation formed by them, we can find no alternative. We accept the Langs' testimony that they were primarily interested in acquiring a lodge, but the record indicates they were satisfied to buy the stock and operate the lodge in the old corporate form when they found there was no other way they could acquire the lodge. It was not until almost a year and a half later when they realized the financial and tax ramifications involved that they decided to liquidate Kim-Sek, and the liquidation occurred almost 3 years after they bought the stock. It is true that there *622 were delays from causes beyond their control, such as the transfer of the park permit, but these arose primarily after they decided to liquidate. We do not believe the Kimball Diamond doctrine can help them under the circumstances. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Arthur W. and Virginia C. Lang, docket No. 8855-79; and Lang Properties, Inc., docket No. 8856-79.↩
2. Petitioner Lang Properties, Inc., operates and files its Federal income tax returns on a fiscal year ending Sept. 30. The remaining individual petitioners were calendar year taxpayers.↩
3. In his statutory notices of deficiency sent to the individual petitioners, respondent disallowed the standard deduction, part of the medical expense deduction, and part of the sales tax deduction claimed by the individual petitioners. Respondent allowed them a $ 100 dividend exclusion and increased the individual petitioners' allowable interest expense. Petitioners do not contest the correctness of these adjustments if it is found that the various transactions constituted a reorganization instead of a purchase of assets. Similarly, respondent concedes on brief that if the various transactions constituted a purchase of assets by the new corporation, then petitioners should prevail on all the various issues presented herein.
4. Kimball and Matousek were in favor of canceling this agreement after one of their accountants, Richard J. Kellog, advised them that the gain realized on the transaction would not qualify for installment reporting. The Langs agreed to the sellers' request to cancel the agreement, since under the provisions of the lease, the Langs had agreed to pay the insurance premiums for an SBA Guaranty and Escrow account. If the SBA guarantee was not forthcoming, the Langs had further agreed to pay $ 30,000 to the lessors (Kimball and Matousek) which would be a deposit for the last 6 months of the lease period. The Langs in fact were unable to obtain the SBA guarantee, and rather than having to deposit $ 30,000 with the lessors, they decided to cancel the agreement.↩
5. Apparently Hudak believed that if the Langs formed a new corporation, which then acquired the Langs' stock in Kim-Sek, the new corporation would be able to reflect on its corporate books the price the Langs paid for the Kim-Sek stock. The Langs never implemented Hudak's proposal.↩
6. Todd believed that the liquidation of Kim-Sek would be taxable at capital gains rates under sec. 331(a) and that the newly formed corporation would take an adjusted basis equal to the fair market value of the assets under sec. 334(a).↩
7. Part of the delay in liquidating Kim-Sek, once the Langs decided to liquidate it around May 1972, was caused by the Forest Service's requirement that Kim-Sek's park permit be transferred to petitioner and that such transfer be approved by the Forest Service.↩
8. Arthur and Harold were both 50-percent shareholders in petitioner.↩
9. Unless indicated otherwise, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue. In his statutory notice of deficiency, respondent has asserted that the liquidation of Kim-Sek followed by the Langs immediately transferring its assets to petitioner, constituted a reorganization under sec. 368(a)(1)(F), or alternatively, under sec. 368(a)(1)(D). At trial and on brief, neither party addressed the issue of what applicable subsection applied in the event we found a reorganization. Rather than decide this without the benefit of the parties' briefs and arguments, we have left the choice of the applicable reorganization provision undecided. See Davant v. Commissioner,366 F.2d 874 (5th Cir. 1966), revg. on another issue 43 T.C. 540↩ (1965).
9a. We observe that in the parent-subsidiary context, the holding in Kimbell Diamond Milling Co. v. Commissioner,14 T.C. 74 (1950), has been substantially pre-empted by sec. 334(b)(2). International State Bank v. Commissioner,70 T.C. 173↩ (1978).
10. Sec. 368(a)(1) provides in pertinent part: For purposes of * * * of this part, the term "reorganization" means-- (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders * * * is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356; * * * (F) a mere change in identity, form, or place or organization, however effected.↩
11. The fact that no stock was issued by petitioner to the Langs or Kim-Sek does not preclude qualification of the transaction as a sec. 368(a)(1)(D) reorganization because, as we noted in James Armour, Inc. v. Commissioner,43 T.C. 295 (1964), the Langs already owned all the stock of both Kim-Sek and Lang Properties so it would have been a meaningless a meaningless gesture to issue additional stock of petitioner. See Atlas Tool Co. v. Commissioner,614 F.2d 860, 865 (3d Cir. 1980), affg. 70 T.C. 86↩ (1978).
12. Both parties implicitly agree that if the payments resulted in a distribution, that secs. 301 and 316 govern.Accordingly, we have treated them as the applicable sections. Compare, American Manufacturing Co. v. Commissioner,55 T.C. 204, 228↩ (1970).